# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **MILTON D. FAISON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00530 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Milton D. Faison, Pro Se Plaintiff; Nancy Hull Davidson, Office of the Attorney General, Richmond, Virginia, for Defendants.*

The plaintiff, Milton D. Faison, a Virginia prison inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Faison asserts constitutional challenges to certain classification procedures that have allegedly prevented him from earning his release from the highly restrictive segregated confinement conditions at Red Onion State Prison ("Red Onion"). After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted.

## I.

Faison, currently incarcerated at Red Onion, is serving a term of confinement in the custody of the Virginia Department of Corrections ("VDOC").[1] He was classified to administrative segregation at Red Onion in early 2015.

---

[1] The VDOC's website lists Faison's expected release date as August 2, 2069.

Red Onion and its sister facility, Wallens Ridge State Prison ("Wallens Ridge"), house all VDOC "Level S" inmates. Level S is reserved for inmates who must be managed in a segregation setting.[2] Under current policies, once a VDOC inmate is classified as Level S, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 6-19, ECF No. 17-1.) The version of this policy that Faison is challenging became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The step-down program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the

---

[2] According to the VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2(IV)(G)).

procedure, they are rewarded by moving to the next step and earning its additional privileges.

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." (OP 830.A(III).) The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*)

Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id.*) On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that

harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive:

Intensive Management (IM):
IM-0
IM-1
IM-2
IM-SL6
Special Management (SM):
SM-0
SM-1
SM-2
SM-SL6
Step-Down—Level VI General Population
Structured Living—Phase 1 and Phase 2
Security Level V General Population

The step-down program in OP 830.A is a so-called cognitive program that includes pro-social goals and requires the inmate to complete a workbook set called the *Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it.

All Level S inmates in the IM and SM categories are housed in single cells and are not permitted out of their cells unrestrained. They have limited out-of-cell

activities and privileges. As an inmate meets the standards for discipline, responsible behavior, self-improvement, and programming of his step assignment and progresses from SM-0 to SM-1 or SM-2, or from IM-0 to IM-1 or IM-2, he will earn greater privileges. An IM or SM inmate who does not meet the goals of his current step assignment can be moved back to a lower step and have his privileges reduced accordingly. Some inmates assigned to a lower step may be required to start over with the *Challenge Series*; they must then work with treatment staff to complete its exercises again to achieve positive changes in thought processes and social skills. An inmate's refusal to participate in the step-down program may be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain, stripped of the privileges he had earned in the higher step, until he chooses to participate.

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge

positive performance and motivate improvement where needed. (OP 830.A(IV)(D).)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings. (*Id.*)

Inmates in the SL6 step-down pod may progress through two phases.[3] In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants. (*Id.*) Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, they have outside recreation with other

---

[3] In addition to the SM-SL6 step-down pod, inmates at this stage may be assigned to: (a) the secure allied management ("SAM") pod, designed for inmates who may be vulnerable to victimization because of cognitive impairment or other factors; or (b) the secure integrated pod ("SIP"), designed for inmates who intentionally commit multiple minor disciplinary infractions to stay in segregated housing. The programming in the SAM and SIP pods differs from the step-down pod and is intended to assess inmates' ability to socialize safely with other inmates and encourage them toward a move to a general population.

inmates for an hour, twice a week, and they can walk to meals with other inmates to eat their meals together in the dining hall.

The IM pathway under OP 830.A is different than the SM pathway. If an inmate reaches IM-2 status, and officials determine that he is not ready to progress to the SM steps toward classification to the SL6 pods, he can become eligible for assignment to Level 6-IM, also known as the Closed Pod. The Closed Pod is expressly designed "to create an opportunity for an increased quality of life for offenders possibly facing a long term in high security."[4] (OP 830.A(IV)(G)(1).) Closed Pod inmates continue to have single-celled housing, segregated recreation, and out-of-cell restraints. Closed Pod inmates can, however, earn more privileges than other IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and extended in-person visitation.

---

[4] OP 830.A(IV)(G)(2)(g) states:

> Restricted freedoms and interaction with staff and other offenders for the IM population is temporary. There is a strong commitment to develop a model to support an improved quality of life and greater opportunities for self-improvement for this dangerous population. The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others. However, at the time of this writing, guidelines or models are not available for predicting safety with a population that has a proven history of carrying out extreme and/or deadly violence. Once the larger Step-Down plan in general is implemented and stable, attention will be focused on additional IM step-down opportunities.

Case 7:15-cv-00530-JPJ-RSB   Document 20   Filed 09/26/16   Page 7 of 27   Pageid#: 139

In addition to the weekly progress ratings by the Unit Management Team, OP 830.A(IV)(K)(5) and other operating procedures require that all segregation inmates, including those participating in the step-down program, be routinely reviewed by the Institutional Classification Authority ("ICA") at least every ninety days. The record reflects that, among other things, the ICA reviews and acts on recommendations for step increases or reductions.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, according to OP 830.A(IV)(K)(1)(a), "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1(IV)(G), all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access.

Faison arrived at Red Onion from Wallens Ridge in June 2012. Since that time, Faison has been assigned to various housing units as the ICA found appropriate for his behavior. On January 20, 2015, after Faison's annual review,

-8-

the ICA increased his security classification from Level 4 to Level 5. Factors for this status change included three disciplinary infractions Faison had received during the annual review period and his participation in the Department of Correctional Education ("DCE") program for only nine days before being removed due to an infraction. VDOC records reflect that Faison has been convicted of thirty-three disciplinary offenses since he entered VDOC custody, seven of which have occurred since his arrival at Red Onion.

After another ICA hearing in early February 2015, the ICA recommended that Faison be assigned to Level S; this recommendation was approved on February 23, 2015. The ICA report on the Level S hearing noted staff reports that

> Offender Faison was charged with attempted [sic] to escape/making plans to escape. On January 29, 2015 during a shakedown Offender Faison was found to be in possession of a homemade handcuff key. He was also charged with a 102-possession of a weapon. During the same search it was discovered that he had cut holes in his mattress and fixed razor blades through[ t]he holes so that if someone ran their hands through/over the mattress it would cause injury.

(Barksdale Aff. Enclosure B, at 19, ECF No. 17-1.)

Faison then started the *Challenge Series*, and over the next several months, he completed five of the seven workbooks. On October 13, 2015, Faison was advanced to IM-1. In February 2016, Faison states that he was advanced to IM-2. The defendants state that under OP 830.A, if Faison continues to progress through

-9-

the step-down program and completes the last two workbooks, the ICA can review him for possible removal from Level S.

Liberally construed, Faison's verified § 1983 Complaint asserts claims that Red Onion officials unfairly classified him under OP 830.A as an IM status inmate without federally required procedural protections, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that those conditions themselves have violated the Eighth Amendment's prohibition against cruel and unusual punishment. Faison sues VDOC administrators for signing OP 830.A into effect and failing to correct the alleged constitutional violations. He also sues supervisory and treatment officials at Red Onion for the undesirable conditions and for improperly making or failing to correct the allegedly unfair classification decisions imposed on him under OP 830.A, allegedly without sufficient due process. Faison seeks monetary damages and injunctive relief ordering that OP 830.A and the *Challenge Series* be abolished.

In Faison's Complaint and other submissions, he complains that the Dual Treatment Team, rather than the ICA, changed his classification to IM status outside his presence, giving him no opportunity to offer argument, contradictory testimony, witnesses, or evidence, or a chance to appeal; that this status change occurred after someone planted a weapon in his cell; and that IM status permanently prevents him from working his way out of segregated confinement at

Red Onion. He contends that even if he, as an IM inmate, completes the *Challenge Series*, he can only progress to the Closed Pod, whereas SM inmates who complete the same series can work their way to general population. Faison also complains about the limited activities and privileges provided to IM status inmates, including that they are not permitted recreation in the pod, gym, or recreation yard, and cannot have contact visits. Finally, Faison complains that it is the Dual Treatment Team, rather than the ICA, that recommends any changes to an inmate's progress in the step-down program. He also alleges that his term as an IM inmate has caused him stress, anxiety, and discomfort from knowing he is permanently assigned to such restrictive conditions.

The defendants have filed a Motion for Summary Judgment, supported by copies of OP 830.A, its charts of IM and SM requirements, and its progress report forms. They also present the affidavit of Red Onion Warden Earl Barksdale, which describes these and other relevant procedures as well as Faison's recent progress through the step-down procedures.

## II.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

I must draw all reasonable inferences from the facts in favor of Faison, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis omitted) (citation omitted)). However, Faison cannot defeat the defendants' properly supported summary judgment motion with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F.

-12-

Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

## B. Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation,[5] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Faison does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Faison (a)

---

[5] Faison may also be contending that OP 830.A violates his substantive due process rights. Such a claim fails, however. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Faison's claims that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015). Therefore, I will address Faison's complaints about the ill effects of living conditions at Red Onion separately, under the applicable legal standard for Eighth Amendment claims.

points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[ ] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Faison makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Faison is challenging, not his classification to Level S, but rather, his classification to IM status instead of SM status under OP 830.A and the subsequent classification adjustment decisions within that pathway. He apparently believes that these procedures stand in his way of being released from segregation to general population conditions. The defendants agree that VDOC operating procedures "create[] an expectation that 'S' level offenders will receive reviews of their classification status." (Defs.' Mem. Supp. Summ. J. 13, ECF No. 17.) Specifically, OP 830.A(IV)(K)(5) and Appendices F and G require review every ninety days. Because this review process includes decisions about whether to advance the inmate to the next status level in the step-down procedures, I conclude that this periodic review policy creates a potential liberty interest for Faison in being released from the restrictive conditions of his current security classification. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state

prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest).

I must next determine if Faison's continued confinement in the various segregation classifications within the OP 830.A categories imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Neither party has provided me specific information about restrictive conditions, if any, dictated by the particular sentence or sentences that Faison is serving. Given the fact that Faison has enjoyed a nonsegregation security classification for some periods during his VDOC custody, I will use the general population status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527 (concluding "that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence").

The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates, and even disciplinary action "in response to . . . misconduct fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485;

*Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S. at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*). Moreover, "[t]he State's first obligation must be to ensure the safety of guards and prison personnel, the public and the prisoners themselves." *Wilkinson,* 545 U.S. at 227. Thus, "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012).

Most importantly, the Supreme Court has consistently employed a due process analysis that encourages prisons to implement written management

policies while minimizing the involvement of the federal courts "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83). "This approach . . . provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions." *Prieto*, 780 F.3d at 255. District courts must respect the Supreme Court's "judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional systems." *Id.*

In *Wilkinson*, without a point-by-point comparison of segregation and general population conditions, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a particular state "supermax" prison. In reaching this conclusion, the Court carefully distinguished the supermax conditions from normal segregation unit conditions on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[6] *Wilkinson*, 545 U.S. at 214. Second, they were assigned for "an indefinite period of time, limited only by [the]

---

[6] The conditions at the supermax at issue in *Wilkinson* included the following: "Almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. The Court noted, however, that the lack of human contact was the most distinctive of these living conditions and that the conditions were atypical when combined with the additional factors of indefinite duration and disqualification for parole. *Id.* at 224.

Case 7:15-cv-00530-JPJ-RSB   Document 20   Filed 09/26/16   Page 17 of 27   Pageid#: 149

inmate's sentence." *Id.* Third, once assigned to supermax, "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. The Court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32. In addition to conditions similar to those at issue in *Wilkinson*, the plaintiff in *Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." *Id.* at 531.

Prison policies gave rise to the indefinite terms of supermax confinement that concerned the courts in these cases. In *Wilkinson*, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. In addition, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once initially, thirty days after his arrival, and annually thereafter. *Id.* at 217. The policy at issue in *Incumaa* required review of the plaintiff's status every thirty days by an institutional classification committee ("ICC"), but that review process

provided no clear criteria for him to become suitable for release from the supermax. 791 F.3d at 522-23. Assigned to the supermax as a member of a security threat group, policy provided that the plaintiff could nevertheless qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." *Id.* Policy further defined "behavior level" as including a clear disciplinary record and the ICC's evaluation of the plaintiff's overall compliance with "policies and procedures" of the institution. *Id.* at 522. In twenty years, the plaintiff had never incurred a disciplinary infraction, but the ICC repeatedly recommended his retention at the supermax without providing any behavioral basis for doing so. *Id.* at 521-23.

Without question, VDOC inmates classified to Level S are confined under highly restrictive conditions at Red Onion, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside the cell only in retraints. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh, because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Faison contends that the conditions imposed under OP 830.A are atypical and significant, particularly IM status, because it is allegedly permanent. It is true

that as long as an inmate remains assigned to any step within the IM pathway, he will not be assigned to full general population conditions. The least restrictive step an IM inmate may reach is the Closed Pod, which imposes conditions that are more restrictive than those of other, nonsegregation housing assignments. However, the defendants' evidence and the terms of OP 830.A and other VDOC procedures indicate that an inmate's assignment to IM status is routinely reevaluated, both during his informal ICA reviews conducted every ninety days and during his annual, formal ICA review. Faison offers no evidence to refute the defendants' evidence that, at any of these reviews, evaluators could determine that Faison's progress toward meeting the goals of the *Challenge Series* and his continued infraction-free behavior warrant an assignment to a step on the SM pathway or removal from Level S altogether. From Level V or VI, he could progress to a general population assignment and eventual transfer to a lower security level prison.

Faison's own classification history also belies his contention that assignment to IM status is a permanent or indefinite assignment to the harshest segregation conditions. He was classified to IM-0 after a disciplinary infraction involving possession of a weapon in his cell. Because he has participated in the procedures of OP 830.A, Faison has moved to the less restrictive steps of IM-1 and IM-2. In

so doing, he has earned additional privileges. If he continues to progress, he can earn more privileges and more out-of-cell socialization activities.

After careful review of OP 830.A, I conclude that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate is subject to long-term, restrictive conditions, but that status need not be permanent or indefinite if the inmate chooses to participate in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP 830.A's steps allow him to make measurable progress toward reclassification to lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A, an inmate's confinement in segregation at Red Onion is, for a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

For the reasons stated, I find no material fact in dispute on which Faison can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence.

Conditions there, while restrictive, can improve in defined stages based on Faison's own efforts and progress toward cognitive and behavioral changes. Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections. Thus, I conclude that Faison has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification proceedings. *Sandin*, 515 U.S. at 486-87.

Faison also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures themselves. Faison raises complaints about the procedures used to reduce his classification to IM status and the reason given for that change; the alleged lack of evidence supporting the IM status change; and the alleged use of the Dual Treatment Team, rather than the ICA, to recommend changes. However, all these actions are, at most, alleged violations of the OP 830.A policies themselves. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would

otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Faison's claims that one or more of them violated his constitutional rights by changing his classification under OP 830.A without due process. I will grant the Motion for Summary Judgment on Faison's due process claims accordingly.

## C. Equal Protection.

The Equal Protection Clause[7] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests."

---

[7] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

-23-

*Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.* Faison does not state facts supporting these necessary elements of his equal protection claim.

First, Faison has not demonstrated that he was similarly situated to inmates in SM status when officials classified him to IM-0 status. Faison's disciplinary infractions warranted different treatment, for security reasons, than he had previously received in other Red Onion housing units before the infractions. Officials could lawfully treat him differently from other segregation inmates with histories of fewer, less serious, or less recent disciplinary convictions. Faison complains that other inmates in lower security level VDOC prisons incur disciplinary infractions without being reclassified to IM status. He offers no evidence, however, that these other inmates, who remain in less restrictive conditions than those found at Red Onion, have terms of confinement as lengthy as Faison's and have incurred thirty-three disciplinary infractions in the same short space of years as Faison has.

Second, Faison does not show that he has been treated differently than any other inmate during periodic reviews for step changes. Neither Faison nor any other Level S inmate can change his step status under OP 830.A merely by avoiding disciplinary convictions and being polite. A step change requires his

-24-

progress on the *Challenge Series* curriculum and the classification officers'
recognition that he is working to make positive changes in his thinking and
behavior.

Third, while the OP 830.A step-down procedure purposefully treats SM and
IM status inmates differently, these differences are rationally related to legitimate
governmental purposes. Namely, this procedure reasonably uses the incentive of
earning increased privileges and lower restrictions to encourage improved offender
behavior and self-development "in a manner that maintains public, staff and
offender safety." OP 830.A(I). The logical connections between the policy's
provisions and the furtherance of its legitimate penological goals are self-evident.
*See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is]
perhaps the most legitimate of penological goals.").

For the stated reasons, I find no material dispute of fact on which Faison
could prove an equal protection violation here. Therefore, I conclude that the
defendants are entitled to summary judgment as a matter of law and will grant their
motion on this claim.

## D. Eighth Amendment.

Faison's final challenge to OP 830.A asserts that his status under OP 830.A
offends the prohibition against cruel and unusual punishment of the Eighth
Amendment, which "protects inmates from inhumane treatment and conditions

while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Faison's allegations do not show that he has suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion. He does not allege that he has been deprived of any necessity for life, such as food, shelter, or medical care. Rather, he complains about having only segregated recreation — not being allowed recreation in the pod or recreation yard

-26-

— and about having no contact visits. Faison conclusorily alleges that the conditions in IM status have caused him to experience stress and anxiety. He fails to present facts, however, showing that these mental health concerns have qualified, at any point, as serious or significant harms, or that he has ever needed professional mental health care for them. For the stated reasons, I find no material dispute of fact on which Faison could prove his claim that he has been subjected to unconstitutional conditions. Accordingly, I will grant the defendants' Motion for Summary Judgment as to his Eighth Amendment claim.

### III.

For the reasons stated, I conclude that Faison's constitutional challenges to OP 830.A are without merit, and the defendants are entitled to summary judgment as a matter of law. It is accordingly **ORDERED** that the defendants' Motion for Summary Judgment (ECF No. 16) is GRANTED.

A separate judgment will be entered herewith.

ENTER: September 26, 2016

/s/ James P. Jones
United States District Judge